UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THAI VANG,

     Plaintiff,

     v.                                  Case No. 09-C-0136

CALLENOR COMPANY, INC.,

     Defendant.

## DECISION AND ORDER ON THE DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

The plaintiff, Thai Vang, filed this action on February 10, 2009, alleging a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1). The plaintiff alleges discriminatory conduct based on his national origin constituting a hostile work environment and retaliation for his opposition to the hostile work environment.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391(b). The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 3 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

On December 11, 2009, the defendant, Callenor Company, Inc. (Callenor) filed a motion for summary judgment. (Docket #19). This motion is fully briefed and will be addressed herein.

# MOTIONS FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant.

In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 248; see also, Celotex Corp., 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322 (emphasis added).

Evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]; Fed. R. Civ. P. 56 [e]).

### Relevant Undisputed Facts[1]

Defendant Callenor Company, Inc., a Wisconsin corporation located in Menomonee Falls, Wisconsin, manufacturers paper tubes and cores which are used for packaging display poles and shipping tubes. It has a total of approximately 25 employees.

Mike Weyer is the general manager of Callenor and has worked for the company for 23 years. He reports to the owner of Callenor and is the highest management person on site. Weyer is generally responsible for disciplining employees. In the past, Callenor followed a procedure for discipline in which Weyer would issue verbal discipline. In most cases, if problems persisted following verbal discipline, Weyer would adjust wages and the possibility of termination would be discussed. It is very rare for Callenor to fire someone.

John Arts is the foreman at Callenor and reports to Weyer. He has worked for the company for 24 years and supervises the employees on the production floor. He is the plaintiff's direct supervisor. Arts generally is not responsible for writing up employees.

The plaintiff applied for employment with Callenor on January 29, 2007, and was employed by the company from February, 2007, until December 4, 2007. He is from Laos and, to the best of his knowledge, was born in Laos. Xay Lo, the plaintiff's brother-in-law, also was an employee of Callenor and was born in Thailand. Both Lo and the plaintiff are

---

[1]      As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed. (Docket ## 21, 26, 30). Citations to sources of quoted excerpts have been included, even when those excerpts are undisputed.

Hmong. Lo told the plaintiff that Callenor had an opening and he applied. Arts interviewed the plaintiff and hired him as a table helper. Callenor had approximately 20-25 employees during the time the plaintiff was employed there.

Callenor employs machine operators and table helpers in its production facility who are responsible for manufacturing the products. Table helpers assist machine operators. They routinely work for a single machine operator, but periodically are assigned to other machine operators. The plaintiff got along well with his co-workers in general, liked his job at Callenor, and wanted to continue working there.

In 2007, Callenor had a variety of work shifts. Machine operators worked ten hours per day, Monday through Thursday. Table helpers, like the plaintiff, worked eight hours per day, five days per week. The plaintiff's regular hours were 6:00 a.m. to 2:30 p.m. There were a number of instances in which a customer would need a product very quickly and overtime was necessary to meet the customer's demands. If Callenor needed machine operators to work overtime, they would work on Friday for 10 hours. If table helpers were needed to work overtime, they would work two additional hours per day, until 4:30 p.m. If overtime was necessary, Arts would go around and ask if table helpers could stay and work late. This would usually occur around noon. However, Arts would not always have advance notice if overtime was going to be necessary because it could change with a phone call from a customer, and could occur even as employees were walking out the door.

In 2007, overtime was generally performed on a voluntary basis. Callenor did not have a written policy on overtime in 2007. The parties agree that during the voluntary period, if a table helper indicated he or she could not stay until 4:30 p.m., no disciplinary action would be taken against the employee. See Plaintiff's Response to Defendant's

Proposed Finding of Fact No. 38. The parties also agree that there was a verbal policy that "if you want the job, you should be here when we need you." (Deposition of Michael Weyer [Weyer Dep.] at 50); See Defendant's Response to Plaintiff's Proposed Findings of Fact No. 82. The year 2007 was a record sales year for Callenor and employees worked a significant amount of overtime. Weyer estimated that employees were working, on average, about six to eight hours of overtime per week that year.

Around June or July, 2007, there was a period of time when the workload was much heavier and overtime was mandatory. Callenor informed all employees at an employee meeting that overtime was no longer voluntary.

In June, 2007, Arts handed the plaintiff a copy of his employment application. Arts had circled the section of the application that asked if the plaintiff was willing to work overtime and the plaintiff had checked "yes." Arts did not say anything during this exchange. After Arts showed the plaintiff his application, he worked overtime much of which was not mandatory.

Tony Fendt was a machine operator and a co-worker of the plaintiff's. He had worked for Callenor for 20 years. Although the plaintiff was not assigned to work with Fendt, he periodically would be required to work with him. Fendt would, on a daily basis, make racially disparaging remarks toward the plaintiff. Fellow employees James Radtke and Corey Brown heard Fendt call the plaintiff names. For example, Fendt would call the plaintiff "slant eyes" or "gook." (Deposition of Thai Vang [Vang Dep.] at 72). Radtke heard Fendt call the plaintiff "dumb Hmong," "stupid Hmong," or "idiot Hmong." (Deposition of James Radtke [Radtke Dep.] at 18). Fendt repeatedly asked the plaintiff if he ate dog.

Fendt once told the plaintiff, "my daddy should have killed your daddy and all of you back in Laos and should have done it right the first time." (Vang Dep. at 78). Another time, while watching a news report about another person with the last name Vang, Fendt indicated that the plaintiff "better watch [his] back," pointing to him with his fingers shaped like a gun. (Vang Dep. at 69).

The plaintiff called Fendt "round eyes" when Fendt called him "slant eyes." The plaintiff would swear back at Fendt. The plaintiff never told Fendt to stop making offensive comments.

One day in August, 2007, the plaintiff was working when he heard a pneumatic staple gun go off repeatedly. The plaintiff wore shorts that day and one of the staples from the gun hit him in the leg. Fendt was a number of feet away from him when this happened. The plaintiff did not see Fendt until after the staple gun had gone off. When the plaintiff turned around, he saw Fendt pointing the staple gun at his leg. While the staple gun has to be touching something for it to work with full power, it is possible to hold the staple gun away from something and shoot it. A staple will come out, but not with such force that it will stick into skin. The staple that hit the plaintiff stung him, but did not break the skin.

The plaintiff knew he could just walk up and talk with Weyer if he needed to discuss something with him. The parties agree that on August 22, 2007, the plaintiff told Weyer: "I just want to let you know what's going on here. Since day one, I've been harassed by Tony verbally and today, he shot me with a staple gun and I think it's not funny and I need that to stop." (Vang Dep. at 83); See Plaintiff's Response to Defendant's Proposed Findings of Fact No. 42. The parties also agree that Weyer denies that the plaintiff informed him that he had been hit with a staple from Fendt's staple gun. See Defendant's Response to Plaintiff's

Proposed Findings of Fact No. 26. Weyer asked the plaintiff what Fendt had said. The plaintiff told Weyer that Fendt said something to the effect of Fendt's dad should have killed the plaintiff's dad back in Laos. Weyer said: "You're not the first person this has happened to." (Vang Dep. at 85). Weyer told the plaintiff that he would "take care of it." (Vang Dep. at 83); (Weyer Dep. at 89). Weyer did not take notes about the plaintiff's allegations and "didn't feel it was that big of a deal." (Weyer Dep. at 83). Weyer understood that the plaintiff's complaint was that Fendt was harassing him or making comments to him based on his ancestry, his race, or his national origin.

Weyer talked with Fendt the following day. Weyer told Fendt that he had received "a complaint about his mouth and that he better knock it off." (Weyer Dep. at 90). Weyer told Fendt that the plaintiff was offended by some of Fendt's comments. Fendt initially denied making offensive comments and then told Weyer he would stop if the plaintiff stopped. Weyer told Fendt that he had to stop regardless of whether the plaintiff stopped. Weyer never personally heard Fendt make any derogatory or racial comments to the plaintiff.

Fendt recalls that Weyer told him that "Mr. Vang had got offended by some things that were spoke about." (Deposition of Anthony Fendt [Fendt Dep.] at 24). Although Fendt cannot recall the specific comments Weyer told him about, he does recall that Weyer told him that the plaintiff was complaining about getting hit in the leg with a staple from the staple gun. When Weyer brought the staple gun incident to Fendt's attention, Fendt knew exactly what he was talking about and did not deny hitting the plaintiff with a staple. Fendt told Weyer that it was unintentional and he was trying to unjam the staple gun. At the end of the conversation, Weyer did not discipline Fendt for his statements to the plaintiff. A few days

after Weyer's discussion with Fendt, Weyer asked the plaintiff if the situation had improved and the plaintiff told him that "it's not any better." (Weyer Dep. at 99).

The plaintiff never told Arts that Fendt was making comments that offended him. Arts never heard Fendt make any racial statements toward any employee.

Fendt made inappropriate and derogatory comments to everyone on the floor. Fendt would swear at everybody every day. During Fendt's employment with Callenor, Weyer had numerous conversations with Fendt about racial harassment. Fendt made racially offensive statements to Corey Brown, an African-American co-worker. Brown talked with Weyer about these comments and Weyer told Brown it would be taken care of. After that, Fendt stopped making offensive comments to Brown for a period of time, but then resumed. Brown told Weyer again about the comments Fendt was making to him and Weyer then met with both Brown and Fendt. After this second meeting, Fendt stopped making offensive comments to Brown.

Fendt made racially offensive comments to Xay Lo. Lo told Weyer that Fendt was saying offensive things and after that, Fendt stopped making such comments to Lo.

Eventually, in 2007, Callenor went back to the volunteer system for overtime work, which was still in effect in December of that year. Arts was frustrated and complained to Weyer about multiple employees in 2007 who did not want to work overtime. The plaintiff was not the only employee who declined to work overtime during a period in which overtime was voluntary. The plaintiff worked more overtime than some of his co-workers and less than others. During the approximately ten months of 2007 that the plaintiff worked for Callenor, he worked 1,746.50 total hours, which includes 121.50 hours of overtime. In 2007,

table helper Brown worked 1,219 total hours, which includes 131.75 hours of overtime and table helper Tom Toth worked 1,974 total hours, which includes 86.75 hours of overtime.

About a week to ten days before the plaintiff was terminated, Arts told the plaintiff that "from now on, you will start going at 2:30." (Vang Dep. at 95-96). The plaintiff was aware that other employees were staying to work past 2:30 p.m. after Arts told him to go home at 2:30 p.m. This did not seem strange to the plaintiff; he just follows orders.

On December 4, 2007, Arts had an order that needed to get done and another order waiting to be done. Arts got upset that the plaintiff was not going to stay past 2:30 p.m. that day and decided to terminate the plaintiff's employment at the end of the normal shift. The plaintiff told Arts something to the effect of "you told me to go at 2:30, so I am leaving." (Vang Dep. at 101). Arts did not ask the plaintiff to stay after his shift and work late on this day. After the plaintiff had punched out, Arts told the plaintiff to come back the next week to pick up his paycheck and fill out paperwork. The plaintiff asked Arts if he was being fired and Arts told him he was.

At the time of the plaintiff's termination, Arts did not know how much overtime the plaintiff had worked and did not keep track of the plaintiff's absences. The plaintiff had worked overtime on November 28, 2007, which was during the week prior to his termination. Arts never discussed attendance with the plaintiff prior to his termination.

Weyer returned to the facility at about 4:30 p.m. on December 4, 2007. At that time, Arts told him that he had a conflict with the plaintiff and that he had fired him.

Approximately a week after his termination, the plaintiff went to Callenor's facility to ask about his termination. The plaintiff initially met with Weyer and when the plaintiff asked the reasons for his termination, Weyer told him that "it was because he didn't work the

overtime that we needed." (Weyer Dep. p. 44). Weyer also told the plaintiff that his attendance was an issue, but said that he had no idea what his attendance was at the time. At this meeting, the plaintiff wanted to know what Weyer had done with Fendt, relative to an incident that had happened earlier in the year. Weyer responded to the plaintiff's questions "defensively," telling the plaintiff that "it was none of his business." (Weyer Dep. at 45-46). The plaintiff filed a claim of discrimination in December 2007. Callenor disciplined Fendt in February 2008.

## ANALYSIS

Before addressing the motion for summary judgment, this court must address Callenor's contention that the plaintiff cannot assert harassment on the basis of race because the complaint only alleges harassment on the basis of national origin. Callenor also asserts that Hmong is not a national origin, as Hmong people come from several different nations. In his complaint, the plaintiff asserts that Fendt harassed him on the basis of his national origin. However, in his brief opposing this motion, the plaintiff appears either to use the wording "race" and "national origin" interchangeably, or to assert harassment on the basis of both race and national origin. Callenor contends that

The court of appeals for this circuit has recognized that there has been "uncertainty about what constitutes race versus national origin. . . under Title VII" in federal courts. Salas v. Wisconsin Dep't of Corrections, 493 F.3d 913, 923 (7th Cir. 2007) (citing Torres v. City of Chicago, No. 99-C-6622, U.S. Dist. LEXIS 6000, at *6 [N.D. Ill. May 1, 2000]). However, in Salas, the court held that Hispanic constitutes a national origin group under Title VII, even though Hispanics, like Hmong, may be from several different countries. Salas, 493 F.3d at 923. In its analysis, the court relied on the Equal Employment Opportunity Commission

(EEOC) Guidelines (the Guidelines), which states: "[t]he Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group." 29 C.F.R. §1606.1. The court found that "an employer that discriminates against Hispanics may do so because of their appearance or accent, the very characteristics described in the EEOC regulations." Salas, 493 F.3d at 923. In this case, the plaintiff is Hmong and believes that he was born in Laos. Hmong is defined as "a member of a mountain-dwelling people inhabiting southeastern China and the northern parts of Vietnam, Laos, and Thailand." Merriam-Webster, http://www.merriam-webster.com/dictionary/hmong. The plaintiff complains of harassment consisting of comments regarding his appearance and name calling which often included the word "Hmong." Under Salas, Hmong qualifies as a "national origin" and the alleged comments, apart from the issue of whether they constitute harassment, are comments regarding the plaintiff's national origin. Therefore, this court finds that the plaintiff has properly alleged harassment on the basis of national origin.

### Hostile Work Environment Claim

"A hostile work environment claim falls under the general rubric of harassment at the workplace, which can amount to prohibited discrimination in terms and conditions of employment." Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002). A "hostile work environment is created by conduct which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimindating, hostile, or offensive working environment." Cooke v. Stefani Management Services, Inc., 250 F.3d 564, 560 (7th Cir. 2001).

In moving for summary judgment, Callenor contends that the plaintiff has failed to establish a prima facie case of harassment. To establish a prima facie case of harassment based on national origin, the plaintiff must show:

(1) he was subject to unwelcome harassment;
(2) the harassment was based on his [national origin];
(3) the harassment was severe or pervasive enough so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and
(4) there is a basis for employer liability.

Williams v. Waste Mgmt. of Ill., Inc., 361 F.3d 1021, 1029 (7th Cir. 2004) (citing Mason v. So. Ill. Univ. at Carbondale, 233 F.3d 1036, 1043 [7th Cir. 2000]). The parties do not dispute that the plaintiff was subject to unwelcome harassment by Fendt during his employment at Callenor.

A. Harassment "Because of" National Origin

It is well established that "Title VII does not prohibit all verbal or physical harassment in the workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). "[M]istreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (7th Cir. 2001) (citing Oncale, 523 U.S. at 79-80). The fact that employees who share a protected characteristic are treated poorly, but similarly to employees who do not share that protected characteristic, "may give rise to the inference that their mistreatment shared a common cause that was unrelated to [the protected characteristic]." Brown, 257 F.3d at 254. However, if the harassment is more severe or pervasive with respect to one group, then this inference may be overcome. Kampmier v. Emeritus Corp., 472 F.3d 930, 941 (finding that harassment toward the female plaintiff was "far more severe and prevalent" than that endured by the male employees).

Callenor asserts that the plaintiff was not harassed "because of" his national origin, but rather because the perpetrator of the harassment – Fendt – harassed everyone at Callenor with no regard to the others' national origin, race, sex, or other protected characteristic. In other words, Fendt's poor treatment of the plaintiff was not because of the plaintiff's national origin, but because Fendt was by nature a rude person. This is often referred to as the "equal opportunity harasser." Kampmier, 472 F.3d at 940 (quoting Holman v. Ind. Dept. of Transp., 211 F.3d 399,403 [7th Cir. 2000]).

The plaintiff maintains that Fendt's harassing comments, such as calling the plaintiff "slant eyes" or asking the plaintiff whether he eats dog, were based on his national origin. Further, the plaintiff maintains that while Fendt harassed everyone at Callenor, Fendt was not an equal opportunity harasser. Rather, the plaintiff maintains that Fendt's harassment was particularly severe and pervasive with respect to employees of different nationalities and races from Fendt. The plaintiff points to Fendt's harassment of Corey Brown, an African American, and Xay Lo, a Hmong from Thailand, as evidence of Fendt's harsher treatment of minorities.

The undisputed facts establish that Fendt is rude to all of his co-workers at Callenor. However, the facts also show that an African-American and two Hmong employees complained to a supervisor about his treatment of them. Based on the evidence before this court, reasonable jurors could disagree on whether Fendt was an equal opportunity harasser or more severely and prevalently mistreated co-workers of national origins and/or races different from his own. Therefore, this court finds that the plaintiff has raised a genuine issue of material fact regarding whether the alleged harassment was because of the plaintiff's national origin.

B.  Severe or Pervasive Harassment

In order to establish that the harassment was so severe or pervasive as to alter the conditions of the plaintiff's employment and create a hostile or abusive situation, the plaintiff "must demonstrate that it was both objectively and subjectively offensive." Kampmier, 472 F.3d at 941 (citing Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505 [7th Cir. 2004]).  The undisputed facts establish that the plaintiff found Fendt's behavior subjectively offensive and complained to Weyer, a supervisor.

To determine whether the harassment is "objectively offensive," several factors are relevant, "including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." Kampmier, 472 F.3d at 941 (citing Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806-07 [7th Cir. 2000]).  "[L]ess severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level . . .." Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir. 1999) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 [1993]).  "The presence of physical threats undeniably strengthens a hostile work environment claim." Raniola v. Bratton, 243 F.3d 610, 621 (2d. Cir. 2001).

Callenor asserts that the harassment was not sufficiently severe or pervasive to alter the conditions of the plaintiff's employment.  In support, Callenor notes that the plaintiff swore at Fendt and called him names in response to Fendt's behavior.  The plaintiff maintains that the harassment was pervasive because it occurred on a daily basis and was severe because it included physical threats.

The undisputed facts show that Fendt made harassing comments to the plaintiff on a daily basis. However, the facts also show that the plaintiff worked directly with Fendt only periodically, so it is unclear whether these comments were made once a day in passing or consistently throughout each day. The facts establish that the plaintiff never asked Fendt to stop making the harassing comments. In fact, the plaintiff called Fendt "round eyes" and swore at him.

Further, despite the plaintiff's contentions, the facts do not confirm that the plaintiff was subject to anything other than "mere offensive utterance[s]." Kampmier, 472 F.3d at 941. The plaintiff argues that Fendt physically threatened him by pointing a "finger gun" at the plaintiff while they were watching a news broadcast about another person with the last name Vang. The plaintiff cites to Villanueva v. Vill. Disc. Outlet, Inc., 2009 U.S. Dist. LEXIS 100637 (N.D. Ill. 2009), in support of his argument that a finger gun constitutes a physical threat. However, the facts of Villanueva are clearly distinguishable from the facts in this case. In Villanueva, there were other physical threats, including attempts by one harasser to run over that plaintiff and aggressive verbal confrontations by another harasser. Id. at *8-*9. In addition, the court did not find that the finger gun constituted a physical threat, only that it was possible that a jury could find the finger gun, together with the other incidents, severe enough to be actionable. Id. at *14. Thus, Villanueva does not support the contention that an isolated "finger gun" incident amounts to a physical threat. Further, there is no indication in the facts that the "finger gun" was related to the plaintiff's national origin.

The plaintiff also asserts that the staple gun incident constitutes physically threatening harassment. According to the undisputed facts, the plaintiff was not facing Fendt when the staple gun went off, the staple gun was not operating at full power, and Fendt was a number

of feet away from the plaintiff at the time. Fendt also stated that the incident was an accident. These facts, even when considered in the light most favorable to the plaintiff, do not rise to the level of physically threatening harassment.

The facts also do not indicate that Fendt's behavior unreasonably interfered with the plaintiff's work performance. There is no indication that the plaintiff could not focus on or complete his work, or missed or was late to work as a result of Fendt's harassment.

Thus, based on the undisputed facts, this court finds that while Fendt's treatment of the plaintiff clearly was rude and offensive, it was not sufficiently severe or pervasive to rise to the level of actionable harassment under Title VII. Therefore, the plaintiff has not established a prima facie case of harassment based on his national origin.

## Retaliation Claim

The plaintiff also asserts that he was fired in retaliation for his complaints about Fendt. Title VII specifically provides for a cause of action based on retaliation. Under Title VII, an employer may not "discriminate . . . against any of his employees because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3[a]. "Only those acts resulting in adverse employment action are cognizable under Title VII." Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612 (7th Cir. 2001). "[A]n employee may engage in statutorily protected expression under section 2003e-3(a) even if the challenged practice does not actually violate Title VII." Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1457 (7th Cir. 1994). Thus, whether the complained of harassment actually violated Title VII is not relevant to the determination of whether the plaintiff has established a prima facie case of retaliation. "It is

sufficient if the plaintiff has a reasonable belief that [he] is challenging conduct [that violates] Title VII." Id., at 1458 (internal quotations omitted).

There are two distinct ways for a plaintiff to establish unlawful retaliation under Title VII, the direct method and the indirect method. Hill v. Potter, No. 09-2815, U.S. App. LEXIS 18096, *5 (7th Cir. Aug. 30, 2010). "Under the direct method, [the plaintiff] must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). In order to establish that a causal link exists between the protected activity and the adverse action, "the plaintiff must demonstrate that the employer would not have taken the adverse action 'but for' the protected expression." Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 479 (7th Cir. 1995). The plaintiff may do so using either direct or circumstantial evidence. Stephens, 569 at 787. If the plaintiff relies on circumstantial evidence to establish the causal link, it must be "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker." Id.; see also, Hottenroth v. Slinger, 388 F.3d 1015, 1028 (7th Cir. 2004).

Under the indirect method, the plaintiff must first establish a prima facie case by showing that (1) he engaged in statutorily protected activity, (2) he was meeting his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) he was treated less favorably than a similarly-situated employee who did not engage in statutorily protected activity. Hill, U.S. App. LEXIS 18096 at *6; Stephens, 569 F.3d at 786 (7th Cir. 2009). A similarly situated employee is one who "engaged in similar conduct without such mitigating or different circumstances as would distinguish their conduct or the

employer's treatment of them . . .." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). If the plaintiff establishes these elements, the burden shifts to the defendant to provide a "legitimate, non-discriminatory" basis for the adverse employment action. Hill, No. 09-2815, slip op. at 5. If the defendant does so, the plaintiff must establish a genuine issue of material fact as to whether the defendant's proffered reason is pretextual. Argyropoulos v. City of Alton, 539 F.3d 724, 736 (7th Cir. 2008). Pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is 'lie, specifically a phony reason for some action.'" Id. (quoting Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 737 [7th Cir. 2006]).

Callenor does not dispute that the plaintiff engaged in statutorily protected activity when he complained about Fendt's harassment on August 22, 2007, or that the plaintiff was terminated on December 4, 2007. However, Callenor contends that the facts do not support a finding of retaliation under either the direct or indirect methods of proof. Under the direct method, Callenor maintains that there is no causal connection between the plaintiff's complaint and his termination, because Arts had no knowledge of the complaint and more than three months had passed between the complaint and the termination. In addition, Callenor asserts that the plaintiff cannot establish a prima facie case under the indirect method because he cannot show that he was treated less favorably than a similarly situated employee who did not engage in protected conduct. Even if the plaintiff can establish a prima facie case, Callenor maintains that he cannot establish pretext.

The plaintiff maintains that he has established retaliation under either method of proof. The plaintiff contends that there is a casual connection between his report to Weyer and his termination by Arts several months later. Specifically, the plaintiff asserts that Weyer, not

Arts, was responsible for disciplining employees and that Arts must have known about the plaintiff's complaint to Weyer because Weyer would have told him about it. Thus, the plaintiff contends that the evidence supports the inference that Arts and Weyer decided together to terminate the plaintiff as retaliation for the plaintiff's complaints about Fendt. In addition, the plaintiff asserts that he has established a prima facie case of retaliation under the indirect method and that Callenor's proffered reason for his termination is pretextual.

A review of the undisputed facts shows that Arts was not aware of the plaintiff's complaint until after the plaintiff was terminated. Although the plaintiff asserts that Weyer told Arts about the complaint, Weyer's testimony on that point is not definitive. Weyer testified more than once that he "do[es] not remember talking to [Arts] about [the complaint]." (Weyer Dep. at 100, 136-137). What Weyer did say is that he "believes" he "probably would have," mentioned the complaint to Arts, and that he "thinks" they "had maybe discussed it in passing." (Weyer Dep. at 100). In short, neither one of the supervisors recalled Arts having actual knowledge of the plaintiff's complaint.

Moreover, the undisputed facts establish that more than three months had passed between the time the plaintiff complained to Weyer on August 22, 2007, and the time Arts terminated the plaintiff on December 4, 2007. "A substantial lapse in time between the protected activity and the adverse employment action 'is counter evidence of any causal connection.'" Filipovic v. K&R Express Systems, Inc., 176 F.3d 390, 399 (7th Cir. 1999) (quoting Johnson, 70 F.3d at 480); McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 485 (7th Cir. 1996). Courts have found time lapses of less than three months to be too long to establish a causal connection between protected activity and an adverse employment action. Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1039 (7th Cir. 1998) (just under three

months is "insufficient to establish . . . causation"). Thus, this court finds that the lengthy time lapse between the plaintiff's complaint and his termination, coupled with the lack of evidence to establish that Arts had any knowledge of the complaint, is not sufficient circumstantial evidence to allow a reasonable juror to infer intentional discrimination by Arts.

With respect to the indirect method of proof, it is clear that the plaintiff suffered an adverse employment action. However, there are no facts to establish that the plaintiff was treated less favorably than similarly situated employees who did not engage in protected conduct. It is undisputed, as the plaintiff argues, that he worked more overtime than some employees and less overtime than other employees. Nonetheless, the record is devoid of evidence to show whether any of these employees were similarly situated to the plaintiff, did not engage in protected activity, and were treated more favorably than the plaintiff. As such, the facts do not support a prima facie case of retaliation under either method of proof.

For the reasons stated herein, the plaintiff has not established a hostile work environment claim under Title VII. In addition, the plaintiff has not established a prima facie case of retaliation. Accordingly, Callenor's motion for summary judgment will be granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **granted**. (Docket #19).

**IT IS ALSO ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this <u>23rd</u> day of September, 2010.

BY THE COURT:

<u>/s/ Patricia J. Gorence</u>
PATRICIA J. GORENCE
United States Magistrate Judge